IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TERRY STACY, | Case No. 1:15-cv-10045 |
| Plaintiff, | Judge: |
| vs. | Magistrate Judge: |
| LIBERTY LIFE ASSURANCE COMPANY OF BOSTON; and ECOLAB HEALTH AND WELFARE BENEFITS PLAN, | |
| Defendants. | |

**COMPLAINT FOR LONG TERM DISABILITY BENEFITS DUE AND DECLARATION OF RIGHTS UNDER THE PLAN**
**29 U.S.C. § 1132(a)(1)(B)**

Now comes the Plaintiff, TERRY STACY, by her attorneys, MICHAEL BARTOLIC and REBECCA K. BRYANT of THE LAW OFFICES OF MICHAEL BARTOLIC, LLC, and complaining against the Defendants, LIBERTY LIFE ASSURANCE COMPANY OF BOSTON and ECOLAB HEALTH AND WELFARE BENEFITS PLAN she states:

**NATURE OF THE ACTION**

1. This is an ERISA case over long term disability insurance benefits involving an insurance carrier that, while it was unconflicted and responsible for deciding whether Plaintiff's employer should pay Plaintiff benefits due to being disabled, determined Plaintiff was disabled from performing her occupation. But, as soon as the insurance carrier became the payor of benefits, it determined the same evidence showed Plaintiff could still perform her occupation on a full-time basis.

2. Once the insurer was both deciding the claim and responsible for paying any benefits, it neglected its obligations under ERISA and instead relied on the flawed opinions of

non-examining file reviewers that were inconsistent with the Plaintiff's medical records, misstated benign surveillance, and explicitly fabricated the treating physician's opinions. The insurer failed to analyze the discrepancies in the file reviewers' reports or give the file reviewers an opportunity to fix the reports—instead it relied on the reports to deny Plaintiff's claim for benefits.

3. Plaintiff brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) seeking benefits due pursuant to the terms of an employee benefit plan.

## JURISDICTION AND VENUE

4. Jurisdiction of the Court is based upon ERISA, and in particular, 29 U.S.C. § 1132(e)(1) and 1132(f). Those provisions give the District Court jurisdiction to hear civil actions brought pursuant to 29 U.S.C. § 1132(a)(1)(B).

5. The ERISA statute provides, at 29 U.S.C. § 1133, a mechanism for administrative or internal appeal of benefit denials. Those avenues of appeal have been exhausted.

6. Venue is proper in the United States District Court for the Northern District of Illinois. 29 U.S.C. § 1132(e)(2).

## THE PARTIES

7. Plaintiff, TERRY STACY (hereinafter "STACY" or "Plaintiff"), was an employee of Ecolab Inc., and a covered employee under The Ecolab Inc. Long-Term Disability Plan.

8. Defendant, LIBERTY LIFE ASSURANCE COMPANY OF BOSTON (hereinafter "Liberty") is the claim review fiduciary of the Plan, insures the Plan, and is

2

responsible for paying any long term disability (hereinafter "LTD") benefits under the Plan. Liberty reviewed Stacy's benefit claim and her appeals of the termination of her benefit payments in this matter. Liberty also administers, but does not pay, benefit claims under the Ecolab Inc. Short Term Disability Plan. By virtue of its role as both payor of benefits and decision maker with regard to eligibility for LTD benefits, Liberty had a structural conflict of interest with respect to Stacy's claim for LTD benefits, and evidence of how that conflict of interest influenced Liberty's decision making appears below.

9. Defendant, ECOLAB HEALTH AND WELFARE BENEFITS PLAN (hereinafter "the Plan") is an employee welfare benefit plan within the meaning of 29 U.S.C. § 1002(1), which provides, among other things, LTD benefits. Ecolab Inc. is the Plan's sponsor. Incident to her employment with Ecolab Inc., Stacy received coverage under the Plan as a "participant" as defined by 29 U.S.C. § 1002(7). This claim relates to long term disability benefits under the foregoing Plan. The Plan is insured by Liberty Life Assurance Company of Boston through a group policy number GF3-840-443918-01. (Exhibit #1).

## STATEMENT OF FACTS

10. Stacy was a participant under the Plan through her employment by Ecolab Inc.

11. As a participant, Stacy was entitled to benefits set forth in the Plan. The Policy defines disability as follows:

12. "**Disability**" or **"Disabled"** means:
    a. For persons other than pilots, co-pilots, and crewmembers of an aircraft:
        i. that during the Elimination Period and the next 12 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and

    ii.  thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

(Exhibit 1).

13. **"Own Occupation"** means:

[T]he Covered Person's occupation that he was performing when his Disability or Partial Disability began. For Purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy.

(*Id.*).

14. "**Elimination Period**" means:

The greater of:
 a. the end of the Covered Person's Short Term Disability Benefits; or
 b. 180 days.

(*Id.*).

15. Stacy is a 55-year-old woman, who was employed by Ecolab Inc. as a Computer Analyst until she ceased working on February 19, 2013, due to her co-morbid conditions of fibromyalgia, hypothyroidism, osteoarthritis, cervical radiculopathy, lumbar facet arthropathy, bilateral foramina narrowing, and degenerative disc and joint diseases.

16. Prior to becoming disabled in 2011 and 2012, Stacy experienced significant symptoms of joint swelling and pain; difficulty sleeping; fatigue; chest, back, knee, and hip pain.

17. Multiple x-ray images supported Stacy's spinal conditions and degeneration.

18. Stacy's various rheumatologic and spinal conditions caused her both chronic and acute pain, nausea, sleep disturbance, depression, and migraines.

4

19. By February 2013, Stacy was no longer able to perform her occupation with continuity due to worsening pain and profound fatigue.

20. Early in her medical leave Stacy's medication regimen frequently changed, but included at varying times: Vicodin, Xanax, Celebrex, Imitrex, Dexiland, Tirosint, Voltaren Gel, and Ambien. Additionally, her treating physicians tried prescribing combinations of Norco, Cymbalta, Lyrica, Amitriptyline, and Ritalin.

21. In June 2013, after seeking additional treatment for her loss of strength and severe pain in her neck, back, wrists, hands, and ribs Stacy's treating Rheumatologist, Dr. Robert Katz, diagnosed her with myofascial pain syndrome.

22. In October 2013, Stacy began seeing Dr. Kathy Borchardt, Psy.D. for cognitive therapy and pain management.

23. In a pain functional capacity questionnaire dated March 24, 2014, Dr. Borchardt stated that Stacy was experiencing a flare of fibromyalgia and that due to the extreme fatigue her conditions were very debilitating. Additionally, she noted that Stacy's medical conditions result in chronic pain concentrated in her hands, knuckles, knees, hips, shoulders, neck, and head; debilitating fatigue; visual processing disturbances; and low physical energy.

24. Dr. Borchardt opined that the unpredictability of Stacy's conditions impair her daily functioning. Additionally, Stacy would require frequent unscheduled breaks for 30–45 minutes at a time due to her chronic pain and concentration deficits, and she would also likely miss more than four days of work each month if she attempted to work.

25. Other treating physicians completed similar reports as to Stacy's functioning and capacity. Treating physicians Dr. Tata and Dr. Katz also opined that

5

Stacy would likely miss more than four days per month due to her pain causing conditions.

26. Liberty agreed that Stacy was totally disabled, when she made a claim for short-term ("STD") benefits upon ceasing work.

27. Liberty was the claims administrator for Stacy's STD claim and LTD claim.

28. Liberty found Stacy to be totally disabled for the full duration under Ecolab Inc.'s self-funded STD plan, but then denied liability under the LTD plan it insurers under virtually the same standard of disability.

29. On September 19, 2013, Liberty denied Stacy's claim for LTD benefits on the basis that restrictions precluding sustained sedentary work capacity were supported for a three-month period (February 15, 2013 through April 16, 2013), but restrictions were not supported beyond April 16, 2013.

30. This denial was based in part upon the functional opinion of a non-examining file reviewing physician.

31. Contrary to extensive medical records of pain causing symptoms and conditions, treating physicians' functional opinions, and imaging supporting spinal and joint degenerative changes the file reviewer opined that Stacy had no sitting restrictions. Moreover, the file reviewer informed Liberty that an "IME [Independent Medical Evaluation] or FCE [Functional Capacity Evaluation] would not likely be helpful in determining work capacity given that the claimant's occupation has only sedentary requirements," notwithstanding his disagreement with the functional evidence in Stacy's file.

32. Before relying on this file reviewer's opinion, Liberty had actual knowledge of numerous courts that it appeared before as a party, which criticized this particular reviewer's functional reports as inaccurate, incomplete, or misstating surveillance results.

33. After a known pattern of flawed functional reports, Liberty continued to use the same file reviewer.

34. Liberty's emphasis on a file reviewer's report in light of the reports from all of her treating physicians, whom report functional impairment in excess of the file reviewer's findings, was erroneous.

35. Stacy timely appealed Liberty's denial on April 15, 2014. With her appeal, Stacy submitted additional evidence supporting that she was disabled from not only her own occupation, but also any occupation. The additional evidence included medical records, witness statements, imaging, and functional capacity opinions from three of her treating physicians.

36. On July 1, 2014, Liberty issued a final denial of LTD benefits, stating that Stacy's restrictions and limitations did not render her continually unable to perform the duties of her occupation throughout the Elimination Period.

37. Liberty again did not explain what about Stacy's treatment or condition changed from the time Liberty itself determined—while it was unconflicted, reviewing the claim under the STD Plan and awarding the employer's money—Stacy's restrictions precluded her from sustained sedentary work capacity with its immediately subsequent decision that Stacy can work full time in her own occupation. The only difference in those two points in time was that with the latter adverse determination, any award of benefits would have to be paid by Liberty.

38. Since being denied LTD benefits, Stacy has been found totally disabled from any substantial and gainful activity by the Social Security Administration.

39. Before rendering any adverse benefit decisions, Liberty placed Stacy under surveillance from July 28, 2013 through July 31, 2013 and relied on the surveillance for both LTD benefit denials.

40. The surveillance video footage indicated Stacy conversing with a neighbor, driving to a restaurant, using her cell phone, grocery shopping, and performing other similar menial tasks.

41. Consistent with all of Stacy's treating physicians' opinions and observations— Stacy's condition often waxes, and wanes. At times, she is capable leaving her house and engaging in limited or occasional activities. Of the four days she was under surveillance, she only left her property on one of the days.

42. The activities that Stacy engaged in while under surveillance were not inconsistent with her disability, but rather they support that she is generally housebound and capable of irregular and limited activity.

43. Liberty's final denial of Stacy's appeal for LTD benefits was principally based on the opinion of a non-examining file reviewing physician and his personal interpretation of the July 2013 surveillance.

44. After reviewing Liberty's records, the file reviewer agreed that Stacy's supported diagnoses were hypothyroidism, fibromyalgia, Vitamin D deficiency, chronic fatigue, and depression; however, he opined, "no medical diagnoses [are] causing impairment. Therefore no restrictions are supported."

45. The file reviewer had a series of un-recorded telephone conversations with Stacy's treating physicians. The conversations were heavily focused on the surveillance from nearly one year prior, which none of the treating physicians had an opportunity to watch. During the conversations, the file reviewer asked the treating physicians to comment after hearing his portrayal of the video footage. The file reviewer later summarized his conversations with the treating physicians in letters and sent the letters to the treating physicians requesting that they be signed and returned.

46. It is clear from the inconsistent summaries in the file reviewer's letters, that the file reviewer repeatedly misrepresented the contents of the surveillance footage and was deceptively vague when describing the telephone conversations.

47. Additionally, the file reviewer's report that he submitted to Liberty is inconsistent with the signed treating physicians' letters *on its face*.

48. The summary of the file reviewer's representation of the surveillance footage to treating physician, Dr. Shaheen, included a representation that Stacy had "ease of walking" and that she was "carrying a small table" but failed to include detail regarding Stacy's slow pace and frequent antalgic gait or that the table Stacy was carrying was a small plastic side table—similar to children's furniture.

49. The summary of the file reviewer's representation of the surveillance footage to treating physician, Dr. Tata, included an implication that Stacy went grocery shopping alone or pushed a grocery cart alone, but failed to include details that Stacy was accompanied by a companion when she went grocery shopping and the companion also helped push the grocery cart. Additionally, the file reviewer broadly described Stacy "pulling weeds in the front lawn," and something the file reviewer described shocked Dr.

9

Tata. According to the signed letter, Dr. Tata stated *based on what the file reviewer described*, Stacy should be able to work part-time in a sedentary position. However, the file reviewer failed to explain that Stacy pulled a handful of weeds in her law for *one minute* (July 31, 2013, from 5:06 P.M.–5:07 P.M.) and his summary is vague as to what about his description of the surveillance shocked Dr. Tata.

50. In complete disregard to the signed letter from Dr. Tata, the file reviewer submitted his report to Liberty, which completely fabricated Dr. Tata's conclusion. The file reviewer stated that Dr. Tata had agreed that Stacy did not have any physical impairment.

51. At most, Dr. Tata conditionally released Stacy to part-time sedentary work in reliance on the file reviewer's description of the video surveillance. But, nowhere in the signed letter does Dr. Tata agree that Stacy is without physical impairment.

52. The summary of the file reviewer's description of the surveillance footage to Dr. Katz has virtually no detail as to any physical tasks the file reviewer orally described to him. Regardless of what the file reviewer did or did not describe, the signed letter memorialized that Dr. Katz's opinion of Stacy's condition was unchanged.

53. In addition to the file reviewer's summary that Dr. Katz signed, Dr. Katz submitted the following written addendum:

> Fibromyalgia is a chronic condition with episodic flares. Flares are unpredictable and vary in intensity and length. Patient may have "good days" but they are infrequent. She also has chronic migraines, insomnia, and severe fatigue. Patient is seen by me on a monthly basis and almost always presents with severe joint and muscle pain, muscle weakness, poor sleep, and low energy. Patient also has positive RA factor on lab work.

54. The letter also indicates that Dr. Katz opined that Stacy was unable to hold any occupation, it was difficult for her to accomplish household chores, and there is a component of depression that is also manifest during her appointments.

55. In complete contradiction to the signed letter from Dr. Katz—the file reviewer fabricated that "Dr. Katz believes the claimant is limited due to a low motivation, anxiety, emotional factors, and depression rather than a physical impairment," in his report to Liberty.

56. Nowhere in Dr. Katz's signed letter does he state that Stacy is without impairment. He acknowledges that Stacy is additionally ailed with pain related depression, but this is in addition to her severe fibromyalgia, which is physically debilitating.

57. Had Liberty read and compared its file reviewer's report to the doctors' letters, it would have easily identified the inconsistencies in the file reviewer's conduct and report.

58. Despite the file reviewer's misrepresentations, vague written descriptions, and bold-faced contradictions between his written report as compared to the written doctors' letters—Liberty relied his opinion to deny benefits.

59. It was unreasonable for Liberty to rely on a file reviewer's opinion that was notoriously flawed and unreliable.

60. Liberty's denial of Plaintiff's claim was contrary to the terms of the Plan.

61. Under 29 U.S.C. § 1132(a)(1)(B), a participant or beneficiary may bring a civil action to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights under the terms of the plan.

62. As a direct and proximate result of Liberty's denial of Plaintiff's claim for benefits, there has been created a case of actual controversy by and between the parties hereto

entitling Plaintiff to a declaration of rights clarifying the benefits to which she is entitled under the Plan.

63. All administrative remedies and conditions precedent have been exhausted and this claim for benefits is ripe for adjudication.

### RELIEF SOUGHT

WHEREFORE, Plaintiff prays for the following relief:

A. That the Court enter judgment in favor of the Plaintiff and against Liberty and the Plan, and award Plaintiff all past due LTD benefits and declare Plaintiff's right to reinstatement of benefits in the amount equal to the contractual amount of benefits to which she is entitled prospectively; and

B. That the Court order the Defendant to pay Plaintiff prejudgment interest on all benefits that have accrued prior to the date of judgment;

C. That the Court award Plaintiff her reasonable attorney's fees pursuant to 29 U.S.C. § 1132(g) and the costs of suit; and

D. That the Plaintiff recovers any and all other relief to which she may be entitled.

Respectfully Submitted,

Date: November 5, 2015

By: /s/ Rebecca K. Bryant
One of the Attorneys for the Plaintiff

Michael Bartolic
Rebecca K. Bryant
The Law Offices of Michael Bartolic, LLC
208 S. LaSalle
Suite 1420
Chicago, Illinois 60604
Tel: 312-635-1600
Fax: 312-635-1601
mbartolic@michaelbartolic.com
rbryant@michaelbartolic.com